UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | | |
|---|---|---|
| DUSTAN HALE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Case No. 3:18-CV-2-CRS-RSE |
| v. | ) | |
| | ) | |
| BOYLE COUNTY, KENTUCKY, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S RESPONSE TO DEFENDANT PENNINGTON'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Dustan Hale, in response to Defendant Thomas Pennington's motion for summary judgment, states as follows:

## I.  Introduction

Thomas Pennington sexually abused Dustan Hale multiple times and ultimately impregnated her while she was a county jail inmate and he was a law enforcement officer. Now, unable to defend his conduct, Pennington argues the sexual contact was consensual. He does not address the power dynamics between a law enforcement officer and an inmate. He does not address the coercive power of the privileges and favors he provided her during the transports on which the abuse occurred.

Instead, he asks the Court to ignore Sixth Circuit precedent, Kentucky policy, and the testimony of every other Defendant in this case, and let him off the hook.

However, Hale provides recent, binding authority that allows the Court to determine that Pennington's conduct was objectively unreasonable and permit Hale an opportunity to ask a jury to hold Pennington accountable.

## II.    Facts

On November 16, 2017, Dustan Hale delivered a baby girl, Caroline Elizabeth.[1] During labor, delivery, and post-partum recovery, a correctional officer sat in the hospital room, and ensured that one each of Hale's legs and arms was shackled to the bed.[2] After a short recovery period, the correctional officer transported Hale back to the Kentucky Correctional Institution for Women.[3] Caroline Elizabeth stayed at the hospital until Kari and Robert Hair—friends of Hale's who she asked to raise Caroline—could obtain the proper documentation to pick her up.[4]

While one in four women who enter a Kentucky prison or jail are pregnant or have children under one-year-old,[5] Hale's situation was unique: she began an uninterrupted period of incarceration on November 6, 2016, over one year before she gave birth to Caroline.[6] DNA testing revealed how she became pregnant during her incarceration: the Kentucky State Police Forensic Laboratories concluded there is a

---

[1] Exhibit A, Norton record regarding discharge plan.
[2] Exhibit B, Norton record regarding shackling.
[3] Exhibit A.
[4] *Id.*
[5] Julie Raque Adams, *Kentucky should help imprisoned mothers, pregnant inmates through the 'Dignity Bill'*, Courier Journal (March 23, 2018), https://www.courier-journal.com/story/opinion/contributors/2018/03/23/kentucky-dignity-bill-imprisoned-mothers-pregnant-inmates-julie-raque-adams/450858002/ (last visited August 12, 2019).
[6] Exhibit C, Dustan Hale deposition transcript, p. 12:5-13:2.

greater than 99.99% probability that Defendant Thomas Pennington is Caroline's father.[7]

When Pennington first met Hale in January 2017, he was a 47-year-old Boyle County Court Security Officer.[8] He lived with his wife and her three children.[9] His job duties included performing most inmate transports for the Boyle County Sheriff's Office.[10] Hale was an inmate at Marion County Detention Center.[11] At 34-years-old, with her physically abusive marriage falling apart, she suffered a drug addiction relapse.[12] With only three months left on a pretrial diversion, Hale failed a drug test and was incarcerated.[13]

Because her criminal charges originated in Boyle County, the Boyle County Sheriff's Office transported Hale between Marion and Boyle County each month. In late 2016, Boyle County Sheriff's Deputy Jim Gies transported Hale.[14] Hale testified that Gies "treated [her like] an inmate on that trip."[15] That is, she was handcuffed in the back seat for the entire transport, they had no personal conversations, and Gies did not allow her any unusual privileges.[16]

---

[7] Exhibit D, KSP DNA test report.
[8] Exhibit A, p. 86:19-24; Exhibit E, Derek Robbins deposition transcript, p. 27:15-18; Exhibit F, Thomas Pennington deposition transcript, p. 14:12-16.
[9] Exhibit F, pp. 9:22-10:23.
[10] Exhibit E, p. 30:10-13.
[11] Exhibit A, p. 94:1-11.
[12] *Id.*; pp. 61:16-68:3-11.
[13] Exhibit A, p. 94:1-11.
[14] *Id.*, p. 94:1-11; p. 101:14-25.
[15] *Id.*, p. 101:14-25.
[16] Exhibit G, Affidavit of Dustan Hale, ¶ 1.

In January 2017, Pennington picked up Hale in Marion County.[17] On the initial transport to Boyle County, like Gies, Pennington sat Hale, handcuffed, in the back seat.[18] Unlike Gies, however, Pennington wanted to discuss Hale's criminal charges.[19] Hale told Pennington she was facing the possibility of ten years in prison.[20] When Hale mentioned her marital problems playing a part, Pennington confided that he could empathize.[21]

A few days later, when Pennington picked Hale up to return her to Marion County, he again placed her in the back seat.[22] Hale, a few months into incarceration and desperate for any extra time outside the jail, asked Pennington if he was transporting anyone else that day.[23] When he said he had to pick up another inmate in Taylor County, Hale asked if she could ride along.[24] Pennington initially declined and told Hale he would drive through Marion County to get to Taylor County but when she suggested he could take an alternative route, Pennington immediately U-turned and drove toward Hustonville.[25]

Pennington stopped at a Hustonville gas station and bought soft drinks for Hale and him.[26] While inside, he left the car running.[27] When he returned to the car, he drove to the side of the parking lot, turned to Hale, and asked if she'd do

---

[17] Exhibit A, p. 86:19-24.
[18] *Id.*, p. 92:5-10.
[19] *Id.*, p. 94:1-11.
[20] Exhibit G, ¶ 2.
[21] Exhibit A, p. 94:1-11.
[22] *Id.*, pp. 92:20-93:10.
[23] *Id.*, pp. 94:24-95:10.
[24] *Id.*
[25] *Id.*
[26] *Id.*, pp. 92:20-93:10.
[27] *Id.*

anything stupid if he put her in the front seat.[28] When she said no, he opened the door and moved her from the back to the passenger seat.[29]

After he left the gas station, Pennington took his handcuff key out of his pocket and asked to see Hale's hands.[30] When she complied, Pennington uncuffed her.[31] Then, he said: "you're in control now."[32] Hale believed Pennington intended that comment to mean he wanted sexual contact in return, especially coupled with Pennington placing her in the seat next to him unrestrained.[33]

Based on her belief that Pennington was suggesting repayment in sexual favors for his supposed kindnesses, Hale offered him oral sex.[34] Pennington smiled.[35] Then he found a remote location and Hale performed oral sex on Pennington until he ejaculated in her mouth.[36] He immediately asked her not to tell anyone.[37] When they arrived at the Taylor County Detention Center, he again handcuffed Hale.[38]

The next month, Pennington again picked up Hale in Marion County.[39] As soon as he exited the Detention Center parking lot, Pennington asked Hale if she was ready to go on a ride.[40] Then, he uncuffed her and drove toward Pulaski

---

[28] *Id.*
[29] *Id.*
[30] *Id.*, p. 96:4-14.
[31] *Id.*
[32] *Id.*
[33] *Id.*; Exhibit G, ¶ 3.
[34] Exhibit A, pp. 96:21-97:16.
[35] *Id.*
[36] *Id.*
[37] *Id.*, pp. 102:21-103:2.
[38] *Id.*, p. 100:17-21.
[39] *Id.*, p. 103:11-23.
[40] *Id.*, p. 104:10-16.

County, not Boyle County.[41] Along the way, he discussed, as he often did, his willingness to intervene on her behalf with the prosecutors in her criminal case.[42] Eventually, he stopped at a gas station in Columbia and left her uncuffed in the front seat.[43] He bought them both soft drinks again.[44] He also permitted Hale to smoke cigarettes that he provided her.[45]

Before he made it to Pulaski County, Pennington pulled over and began kissing Hale.[46] He ultimately had unprotected vaginal intercourse with her and—though she did not expect it—he ejaculated inside her.[47] Afterward, while he was getting dressed, he pulled down the driver's side visor and a condom fell out.[48]

On the next month's transport, Pennington put Hale in the car but didn't say anything or uncuff her.[49] He drove away from the jail very fast.[50] After driving for a while in silence, he blurted out, "why in the hell did you tell?"[51] He confronted Hale because another inmate he transported said she knew about Pennington's sexual contact with Hale.[52] Hale admitted she told a friend at the jail but thought the inmate he transported was asleep during the conversation.[53] Pennington pulled over and asked Hale to take a pregnancy test, which he purchased and brought with

[41] *Id.*, p. 104:10-16.
[42] Exhibit G, ¶ 4.
[43] Exhibit A, p. 105:14-19.
[44] *Id.*, p. 105:14-19.
[45] *Id.*
[46] *Id.*, p. 108:12-21.
[47] *Id.*, p. 111:7-24.
[48] *Id.*, pp. 112:22-113:1.
[49] *Id.*, p. 118:7-23.
[50] *Id.*
[51] *Id.*, pp. 118:25-119:15.
[52] *Id.*
[53] *Id.*

him on the transport.[54] After she took the test, and it returned a negative result, he

kissed Hale.[55] Then, he again had unprotected vaginal intercourse with her.[56]

Afterward, he required her assurance that she would not tell anyone else.[57]

The sexual contact continued on every transport for the next several months.

Pennington had unprotected vaginal intercourse with Hale five times, and oral sex

once or twice.[58]

## III.    Standard of Review

Summary judgment is appropriate only where there is no genuine factual

dispute and the moving party is entitled to judgment as a matter of law.[59] In

assessing whether there is a genuine factual dispute, the Court must believe the

non-moving party's evidence and draw all reasonable inferences from that evidence

in her favor.[60] "A 'judge's function' at summary judgment is not "to weigh the

evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial."[61] Courts *may not* resolve genuine disputes of fact in favor of

the party seeking summary judgment.[62]

---

[54] *Id.*, p. 120:2-15.
[55] *Id*.
[56] *Id*.
[57] *Id.*, p. 120:21-25.
[58] *Id.*, pp. 121:12-14; 123:2-4
[59] Fed. R. Civ. P. 56(a).
[60] *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).
[61] *Tolan*, 134 S.Ct. at 1866, citing *Anderson*, 477 U.S. at 249.
[62] *Id* (emphasis added).

## IV. Argument

### A. Pennington violated Hale's Fourteenth Amendment rights because his sexual abuse of her was objectively unreasonable.

Courts analyze officer-on-inmate sexual abuse claims under the same standard as excessive force claims.[63] When the victim inmate is a convicted prisoner, the inmate prevails only if she proves that the officer violated the Eighth Amendment's prohibition on cruel and unusual punishments by acting "maliciously and sadistically for the very purpose of causing harm."[64] However, as the Supreme Court decided in *Kingsley v. Hendrickson*, "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'"[65]

Because the Constitution requires a less-stringent standard for people presumed innocent, the *Kingsley* Court held that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."[66] The Court based this standard on the Fourteenth Amendment's due process clause.[67] Thus, to establish a Fourteenth Amendment violation, Hale must show only that 1) Pennington purposely or knowingly had sexual contact with her; and 2) that the sexual contact was objectively unreasonable.

The *Kingsley* Court further defined objective reasonableness by citing approvingly a Seventh Circuit pattern jury instruction:

---

[63] *See., e.g., Giron v. Corrections Corp. of Am.*, 191 F.3d 1281, 1289-90 (10th Cir. 1999), citing *Hudson v. McMillian*, 503 U.S. 1 (1992).

[64] *Id.*

[65] *Kingsley*, 135 S. Ct. 2466, 2475 (2015) (internal citations omitted).

[66] *Id.* at 2473.

[67] *Id.*

> You must decide whether Defendant's use of force was unreasonable from the perspective of a reasonable officer facing the same circumstances that Defendant faced. You must make this decision based on what the officer knew at the time of the arrest, not based on what you know now. In deciding whether Defendant's use of force was unreasonable, you must not consider whether Defendant's intentions were good or bad.
>
> In performing his job, an officer can use force that is reasonably necessary under the circumstances.[68]

Or, in a way that may be easier to apply to this case: "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."[69]

In this case, Pennington does not argue that he unintentionally subjected Hale to oral and vaginal intercourse. Neither does he argue—nor could he—that his sexual contact with Hale was rationally related to a legitimate governmental objective. The absence of that rational relationship renders the force objectively unreasonable. Since Pennington also applied force purposely, he violated Hale's Fourteenth Amendment due process rights. Thus, summary judgment on Hale's constitutional claims is inappropriate.

Pennington argues that the Court should apply an Eighth Amendment analysis, even though he admits she was a pretrial detainee.[70] Remarkably, Pennington does not confront *Kingsley* to address why the Court should ignore

---

[68] *Id*.; Seventh Circuit Pattern Civil Jury Instruction 7.09; *Kingsley v. Hendrickson*, 744 F.3d 443, 458 (Hamilton, J., dissenting).

[69] *Kingsley*, 135 S. Ct. at 2473-2474.

[70] DN 53-1, Pennington's memorandum in support of his motion for summary judgment, p. 4.

established Supreme Court precedent. His argument rests solely on his assertion that Hale "couche[d] her constitutional claims against Defendants as a claim of deliberate indifference."[71] Hale included a deliberate indifference claim in her complaint out of an abundance of caution.[72] However, she also pled that Pennington "made an intentional decision" and "did not take reasonable available measure to abate [the risk of harm to Hale], even though a reasonable officer would have…."[73] While Hale included all Defendants in that claim, rather than single out Pennington, and thus drafted the language broadly, that language encompasses an objective reasonableness standard. Further, Pennington's motion is for summary judgment not judgment on the pleadings. The evidence of record—that Hale was a pretrial detainee—necessitates an objective reasonableness analysis.

1. **The objective reasonableness analysis should not include "recklessness" as an element because "recklessness" is subjective.**

In *Love v. Franklin Cty.*, another Court in this District adopted an objective reasonableness analysis for pretrial detainee claims but included "recklessness" as an element.[74] However, the *Kingsley* Court explicitly rejected using a subjective recklessness element in an objective analysis.

This misunderstanding may stem from the *Kingsley* Court's complicated explanation of the two separate states of mind at issue in determining legal

---

[71] *Id.*, p. 5.
[72] DN 39, Hale's First Amended Complaint, ¶¶ 23-31.
[73] *Id.*, ¶¶ 32-37.
[74] *See Love*, 376 F. Supp. 3d 740, 744 (E.D. Ky. 2019).

liability.[75] The first relates to the officer's subjective state of mind regarding his physical acts.[76] The officer must have used force purposely or knowingly, not accidentally.[77] The Court further stated that, in the context of a police pursuit, recklessness might suffice to impose liability.[78] However, the Court did not decide that issue in *Kingsley* because the officers did not dispute that they acted purposely or knowingly.[79]

As that state-of-mind inquiry relates to this case, Pennington does not dispute that he had sexual contact with Hale purposelu or knowingly. Thus, Hale need not discuss and the Court need not consider the subjective idea of recklessness regarding Pennington's state of mind.

The second state-of-mind inquiry is whether the force applied was excessive.[80] This inquiry is wholly objective.[81] In fact, the *Kingsley* Court considered a jury instruction that required the jury to decide, regarding the second state-of-mind inquiry, whether the officers "acted with reckless disregard of [the inmate's] rights."[82] The Court held that asking the jury to consider recklessness "suggested the jury should weigh [the officers'] subjective reasons for using force and subjective views about the excessiveness of the force…. [T]hat was error." Thus, recklessness should play no part in determining whether the force was objectively excessive.

---

[75] *Kingsley*, 135 S. Ct. 2466 at 2472.
[76] *Id*.
[77] *Id*.
[78] *Id*.
[79] *Id*.
[80] *Id*.
[81] *Id*.
[82] *Id*. at 2476-2477.

**B. Hale did not consent to sexual contact with Pennington.**

Because Pennington cannot argue that his sexual contact with Hale was objectively reasonable, he retreats to an allegation that she knowingly and intelligently chose to engage in sexual contact with him. Pennington's argument is appalling but it is also wrong as a matter of law because 1) inmates are not competent to consent to sex with law enforcement officers; and 2) Pennington coerced Hale into sexual conduct with privileges, favors, and exchanges.

    1. **The Sixth Circuit, Kentucky law, and every Defendant other than Pennington agree that inmates are incapable of consent.**

Earlier this year, in *Rafferty v. Trumbull Cty.*, the Sixth Circuit rejected a law enforcement officer's argument that an inmate consented to sexual activity when she exposed her breasts and masturbated in his presence "because he asked for it."[83] The *Rafferty* court based its holding, in part, on the fact that "inmates are generally regarded as unable to consent to sexual relations with prison staff."[84]

In Kentucky, it is more than general; it is clear state policy that inmates cannot consent to sex with law enforcement officers. KRS 510.020(3)(f) states that "[a] person is deemed incapable of consent when he or she is … [u]nder the care or custody of a state or local agency pursuant to a court order and the actor is employed by or working on behalf of the state or local agency." Because of that policy, Kentucky has several criminal statutes aimed at punishing law enforcement

---

[83] *Rafferty*, 915 F.3d 1087, 1092, 1096 (6th Cir. 2019).
[84] *Id*. at 1096.

officers who have sexual contact with inmates. KRS 510.060(1)(e) provides that a law enforcement officer is guilty of rape in the third degree when he subjects an inmate to sexual intercourse. KRS 510.090(1)(e) provides that a law enforcement officer is guilty of sodomy in the third degree when he subjects an inmate to oral sex. KRS 510.120(1)(b) provides that a law enforcement officer is guilty of sexual abuse in the second degree when he subjects an inmate to any sexual contact. When then-Governor Steve Beshear signed a law strengthening penalties for those crimes, he stated that "[t]he inherent power disparity between [law enforcement] officers and inmates precludes there from ever being a consensual sexual relationship between the two."[85]

Governor Beshear's sentiment aligns with common sense. It's difficult to deny even simple requests from a person with power over you, even when their power is limited. Law enforcement officers control nearly every aspect of an inmate's life, including when and what they eat, when they go outside, and how they move from one place to another. That all-encompassing reliance makes it impossible for inmates to make the same type of choice a free person would have the opportunity to make.

Even Defendant Boyle County Sheriff Derek Robbins, who employed Pennington when he sexually abused Hale, agreed that inmates cannot intelligently make that choice. He admitted that "an inmate cannot consent to sexual contact with an officer."[86] Similarly, Barry Brady, who was the jailer at Marion County

---

[85] Exhibit H, article with Beshear's comment on consent.
[86] Exhibit E, p. 45.

Detention Center during Pennington's sexual abuse, agreed that inmates cannot consent to sexual contact with law enforcement officers and that he trained his deputies to know that.[87] Pennington is the only defendant who didn't agree; he asserted his Fifth Amendment right against self-incrimination to all questions regarding consent, sexual contact with inmates, or his interactions with Hale.[88] Sixth Circuit precedent comports with Governor Beshear's, Sheriff Robbins', and Jailer Brady's understanding of consent. Pennington stands alone in his argument that Hale consented to his sexual conduct with her. The Court should deny Pennington's consent defense on this basis alone.

### 2. Pennington coerced Hale into sexual conduct with him.

However, the *Rafferty* court further denied the officer's consent defense because the victim inmate established a factual dispute regarding whether the officer coerced her into sexual conduct. The court cited as support a Ninth Circuit case, *Wood v. Beauclair*, in which that court explained that "[t]he power dynamics between prisoners and guards make it difficult to discern consent from coercion."[89] While the *Rafferty* court did not explicitly adopt it, the *Wood* court established a rebuttable presumption that sexual contact between an inmate and law enforcement officer was non-consensual.[90] The officer could rebut that presumption "by showing that the conduct involved **no** coercive factors."[91] The *Wood* court further set out a non-exhaustive list of coercive factors: "[o]f course, explicit

---

[87] Exhibit I, Barry Brady deposition transcript, p. 36.
[88] Exhibit F, pp. 27:13-28:7.
[89] *Rafferty*, 915 F.3d at 1096, quoting *Wood*, 692 F.3d 1041, 1047-49 (9th Cir. 2012).
[90] *Wood*, 692 F.3d at 1049.
[91] *Id* (emphasis added).

assertions or manifestations of non-consent indicate coercion, but so too may favors, privileges, or any type of exchange for sex."[92]

In this case, the Court can reject Pennington's consent defense without adopting *Wood*'s rebuttable presumption but the analysis is instructive. Hale testified that Pennington provided her multiple favors, privileges, and exchanges. He took her on extended transports, which kept her out of the jail longer than she would have otherwise been, transported her unrestrained in the front seat, bought her soft drinks, provided her cigarettes, gave her his cell phone number,[93] and even offered to talk to the prosecutors in her criminal case to see if he could help her.[94] Each of these favors, privileges, and exchanges are coercive factors. Some of them may not seem like much—a longer car ride, a soft drink, a cigarette—to someone who is free, but the isolation of incarceration can make the smallest privilege feel extraordinary.

Importantly, Pennington's conduct takes place in the context of Hale being in a desperate situation. With young children at home, and a marriage on the rocks, she faced ten years in prison. Pennington found out about her desperation on the first transport. On the second transport, he granted her privileges and suggested repayment. Hale states that she engaged in sexual contact with Pennington at first because she believed he expected repayment.[95] Further, as she interacted with him more, Pennington made her feel like he cared about her and that she could trust

---

[92] *Id.*
[93] Exhibit A, p. 123:17-25.
[94] Exhibit G, ¶ 4.
[95] *Id.*, ¶ 6.

him.[96] Now, she realizes Pennington played on the emotions of a vulnerable, incarcerated woman for his sexual gratification.[97] His offer to talk to the prosecutors about her criminal case is perhaps the most coercive offer of exchange, especially considering the situation Hale faced, and that he never did so.[98] Pennington's emotional manipulation would be detestable but not criminally or civilly actionable between two free people. However, when one person is incarcerated and the other is charged with the incarcerated person's safety and security, even Pennington's emotional coercion is coercion that renders the sexual contact non-consensual.

That these privileges and favors were coercive is made more obvious by the transport on which Pennington believed Hale told someone about his sexual contact with her.[99] He made her sit in the back rather than the passenger seat. He left her in handcuffs. He didn't even talk to her. He withheld the previous supposed kindnesses because he thought the sexual contact was over. Only when he was satisfied that the sexual contact could continue did he extend Hale privileges. Pennington abused his authority to coerce Hale into sex. Under any reasonable interpretation of the rights afforded to pretrial detainees, the Constitution should not permit that conduct. *Wood*'s coercion vs. consent analysis, even short of application of its rebuttable presumption, demonstrates that Hale established coercive factors that create a genuine factual dispute regarding Pennington's consent defense.

---

[96] Exhibit A, Hale depo, p. 115:8-11.
[97] Exhibit G, ¶ 6.
[98] *Id.*, ¶ 5.
[99] *See* p. 6-7, *supra.*

### 3. Rather than argue his conduct was not coercive, Pennington relies on inapposite case law.

Pennington does not even address power dynamics or coercion in his motion. He doesn't attempt to argue that his power over Hale played no role or explain away the multitude of coercive factors. Pennington's strategy is mostly out of necessity. There is no evidence to contradict Hale's coercive factor testimony because Pennington refused to answer any question about his interactions with Hale.[100] Instead, he's forced to rely on the dearth of reasoning in a 20-year-old unpublished Sixth Circuit opinion, *Hall v. Beavin*.[101] The world has changed in the last 20 years, particularly regarding our understanding of the dynamics of sexual assault. If *Hall v. Beavin* was ever binding precedent, *Rafferty* overrules it. Further, every case Pennington cites, including *Hall*, was decided under an Eighth Amendment analysis regarding whether consensual sex could constitute cruel and unusual punishment.[102] As discussed above, this case is not about cruel and unusual punishment. It's about whether a person who is presumed innocent—and is incarcerated only because she was not granted or could not afford bail—should be subjected to coerced sex.

Pennington will no doubt complain in his reply brief that Hale states some things for the first time in an affidavit attached to this response. However, Pennington's counsel deposed Hale under unusual and, frankly, inappropriate circumstances. While Hale is free now, she was still incarcerated during that

---

[100] *See generally*, Exhibit F.
[101] *Hall*, 1999 U.S. App. LEXIS 29700 (6th Cir. 1999).
[102] DN 53-1, p. 6.

deposition. Pennington's counsel brought Pennington to the Kentucky Correctional Institution for Women for Hale's deposition, where he sat next to his attorney while she questioned Hale.[103] Predictably, Pennington stared at Hale while she answered questions about her allegations that he sexually abused her.[104] Hale was intimidated.[105] Because of that, it was necessary for her to provide further context surrounding her interactions with Pennington that she felt intimidated from providing during her deposition. The affidavit also contains information Hale wasn't questioned about in her deposition. That testimony, combined with all other record evidence regarding Pennington's coercion, and an inmate's general inability to give consent, establishes at the very least a factual dispute regarding consent that a jury should decide.

### C. Hale prevails under an Eighth Amendment analysis because Pennington cannot provide a legitimate penological justification for his sexual contact with Hale.

Even if the Court analyzes Hale's constitutional claims under the Eighth Amendment, summary judgment is inappropriate. For her claims to survive under that analysis, Hale would first have to establish a factual dispute regarding whether Pennington's sexual contact with her was "sufficiently serious."[106] In *Rafferty*, the Sixth Circuit noted that "[f]ederal courts have long held that sexual abuse is sufficiently serious to violate the Eighth Amendment."[107] Specifically, the court held that an officer's demands that an inmate expose her breasts and

---

[103] Exhibit G, ¶ 7.
[104] *Id.*
[105] *Id.*
[106] *Rafferty*, 915 F.3d at 1095.
[107] *Id.*

masturbate in front of him on six occasions were sufficiently serious because they were not "isolated, brief, and not severe."[108] In this case, Pennington's six sexual interactions—which included oral and vaginal intercourse rather than exposure and masturbation—are sufficiently serious by any measure.

Second, Hale would have to establish a factual dispute regarding the Eighth Amendment's objective component. The Sixth Circuit has not determined whether an inmate alleging sexual abuse by an officer under the Eighth Amendment is required to meet the heightened malicious and sadistic standard or the less-stringent deliberate indifference standard.[109] However, the *Rafferty* court held that subjecting an inmate to exposing herself and masturbating met either standard because the officer could not conceivably offer a legitimate penological justification.[110] If the conduct in *Rafferty* satisfies either standard, the oral and vaginal intercourse Pennington subjected Hale to does as well. Thus, while the Court should analyze Hale's constitutional claims under a Fourteenth Amendment objective reasonable analysis, Hale's claims would also survive an Eighth Amendment analysis.

### D. Hale's battery claim should survive because she could not consent to Pennington's unlawful touching.

Pennington offers familiar arguments regarding "consent" to support his request that the Court dismiss Hale's battery claim.[111] Pennington cites no case law to support these arguments. However, Kentucky Supreme Court precedent

---

[108] *Id.*, quoting *Jackson v. Madery*, 158 Fed. App'x. 656, 662 (6th Cir. 2005).
[109] *Rafferty*, 915 F.3d at 1096.
[110] *Id.*
[111] DN 53-1, pp. 14-15.

establishes that Hale did not legally consent to Pennington's touching because she was unable to give consent. In *Ten Broeck Dupont, Inc. v. Brooks*, the Court held that "[l]ack of consent is an essential element of battery. Therefore, the absence of consent must be proved as a necessary part of the plaintiff's case."[112] The consent, however, "must be knowingly and intelligently given and may not be the result of … incompetence."[113]

For this proposition, the Court cited KRS 510.020(3). That statute, titled "Lack of consent," states that "[a] person is deemed incapable of consent when he or she is … [u]nder the care or custody of a state or local agency pursuant to a court order and the actor is employed by or working on behalf of the state or local agency." That statute establishes that Hale was legally incompetent and therefore incapable of giving consent to Pennington's unlawful touching. Thus, summary judgment on Hale's battery claim is inappropriate.

### E. Hale's negligence claim should survive if the Court dismisses her battery claim.

Pennington argues that if Hale's battery claim survives, the Court must dismiss her negligence claim.[114] If the Court does not dismiss Hale's battery claim, she does not object to dismissal of her negligence claim. However, if the Court dismisses her battery claim, Pennington made no other argument that the Court should dismiss Hale's negligence claim. Under that scenario, it must survive because Pennington has waived any other argument.

---

[112] *Brooks*, 283 S.W.3d 705 (Ky. 2009).
[113] *Id*. at 726.
[114] DN 53-1, pp. 15-16.

### F. Pennington waived any argument regarding Hale's claims under KRS 446.070.

In Count 8 of her First Amended Complaint, Hale alleges Pennington violated multiple criminal statutes and asserts a right to recover civil damages for Pennington's violations under KRS 446.070.[115] That statute provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." Pennington does not argue that the Court should dismiss Hale's KRS 446.070 claims. Thus, he waived any argument.

### G. Hale abandons her intentional infliction of emotional distress claim.

Although Hale brought in good faith an intentional infliction of emotional distress claim, after discussing with counsel the evidence at the close of discovery, she now abandons it.

## V. Conclusion

Pennington's conduct was wrong. But more than that, it violated Hale in a foundational way. She should never have been in a position to be coerced into sex solely because she was accused of a crime. Tragically, Pennington took advantage of Hale's desperate position for his sexual gratification. That was objectively unreasonable. Thus, Hale respectfully requests that the Court deny Pennington's motion and hold that his sexual abuse of Hale was not consensual; it was coercion.

---

[115] DN 39, ¶¶ 64-67.

Respectfully submitted,


/s/ Aaron Bentley
Aaron Bentley
abentley3B@gmail.com
Belzley, Bathurst & Bentley
P.O. Box 278
Prospect, Kentucky 40059
(502) 690-6054
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that, on August 12, 2019, I served the foregoing via CM/ECF, which will send all parties of record a notice of electronic filing.

/s/ Aaron Bentley
*Counsel for Plaintiff*