UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:18-CV-00002-GNS-RSE

DUSTAN HALE                                                                          PLAINTIFF

v.

BOYLE COUNTY, KENTUCKY;
DEREK ROBBINS; and
THOMAS PENNINGTON                                                       DEFENDANTS


**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on several motions filed by the parties in this case. Plaintiff

has filed a motion for leave to file a notice of supplemental authority (DN 80). Defendants have

filed motions for summary judgment (DNs 53, 55), motions to strike Plaintiff's affidavit (DNs 63,

66), and motions to strike Plaintiff's supplemental authority (DNs 77, 78). The motions are ripe

for adjudication. For the reasons that follow, Defendants' motions for summary judgment (DNs

53, 55) and Plaintiff's motion for leave to file (DN 80) are **GRANTED**, while all other motions

(DNs 63, 66, 77, 78) are **DENIED**.

## I.      BACKGROUND

From November 6, 2016, through April 23, 2017, Plaintiff Dustan Hale ("Hale") was a

pretrial detainee at the Marion County Detention Center in Marion County, Kentucky. (Defs.'

Mot. Summ. J. Ex. 11, DN 55-12; Def.'s Mem. Supp. Mot. Summ. J. 4, DN 53-1; Pl.'s Resp.

Def.'s Mot. Summ. J. 8, DN 59). Because Hale's criminal charges originated in Boyle County,

Kentucky, the Boyle County Sheriff's Office transported Hale between Marion County and Boyle

County each month for court appearances.  (Defs.' Mem. Supp. Mot. Summ. J. 3, DN 55-1; Pl.'s Resp. Def.'s Mot. Summ. J. 3, DN 59).

On January 2, 2017, Defendant Thomas Pennington ("Pennington"), a court security officer and deputy sheriff with the Boyle County Sheriff's Office, picked up Hale from the Marion County Detention Center to transport her to Boyle County.  (Defs.' Mot. Summ. J. Ex. 1, DN 55-2; Defs.' Mot. Summ. J. Ex. 20, DN 55-21; Def.'s Mot. Summ. J. Ex. 13, DN 55-14).  On that trip, Hale sat handcuffed in the back seat of the transport vehicle.  (Hale Dep. 92:5-8, 93:8-10, Sept. 19, 2018, DN 59-3).  At some point during that trip, Pennington asked Hale about her criminal charges, to which Hale "explained that [her] marriage was the shits and [she] had started using cocaine again, and [she] failed a drug test with three months left of [her] pretrial diversion . . . ." (Hale Dep. 93:23-94:13).  When Hale "said[] [her] marriage is the shits, [Pennington] goes, oh, I know how that goes."  (Hale Dep. 94:6-8).

Two days later, Pennington transported Hale back to Boyle County.  (Def.'s Mot. Summ. J. Ex. 13).  Initially during the trip, Hale sat handcuffed in the back seat of the transport vehicle. (Hale Dep. 92:11-12, 93:8-10).  Almost immediately after they left the Boyle County Detention Center, Hale asked Pennington if he had anyone else to pick up, to which Pennington responded that he had to pick someone up in Taylor County.  (Hale Dep. 95:1-5).  Hale then told Pennington that he should let her ride with him to pick up the other inmate because "in jail, you don't get to see daylight very much [and] [i]t was a sunny day."  (Hale Dep. 95:5-7).  Pennington responded by explaining to Hale, "well, I would but I have to go through Marion County to get to Taylor County."  (Hale Dep. 95:7-8).  Hale then suggested an alternative route, which Pennington then proceeded to take.  (Hale Dep. 95:9-10).

Along the way, Pennington stopped at a gas station and went in to buy soft drinks, leaving the car running.  (Hale Dep. 92:20-22).  When he came back, Pennington pulled the car to the side of the gas station parking lot and asked Hale, "you won't do anything stupid if I put you in the front, will you?" to which Hale responded in the negative.  (Hale Dep. 92:22-93:5).  Pennington then opened the door and put Hale in the front of the transport vehicle.  (Hale Dep. 93:5-7).

After leaving the gas station, Pennington took his handcuff key out of his pocket and told Hale to "let [him] see [her] hands[;]" so, Hale "held them up and [Pennington] uncuffed [her], (Hale Dep. 96:7-11).  Upon uncuffing Hale, Pennington said, "you're in control now."  (Hale Dep. 96:11).  Hale "wasn't quite sure what that meant, but being[] that he was a man and [she] was a girl, [she] kind of [believed] maybe he was insinuating something sexual."  (Hale Dep. 96:11-14).  Hale then offered to perform oral sex on Pennington, but then said "I'm just kidding kind of." (Hale Dep. 96:23-25).  Pennington "didn't respond with any words [but] [h]e was smiling."  (Hale Dep. 97:2-3).  Hale then told Pennington to "find a back road."  (Hale Dep. 97:3-4).  Pennington pulled the vehicle off the road, and he and Hale "started kissing."  (Hale Dep. 97:7-14).  Pennington undid his pants, and Hale performed oral sex on him.  (Hale Dep. 97:14).  Pennington then "asked [Hale], please don't tell anyone that this happened" and stated that "he couldn't believe that it happened."  (Hale Dep. 102:22-24).  Hale told Pennington that she "wouldn't tell anyone."  (Hale Dep. 102:24-25).  Pennington and Hale then proceeded to the Taylor County jail, where Pennington then reapplied Hale's handcuffs.  (Hale Dep. 100:5-21).

On February 2, 2017, Pennington again picked Hale up from Marion County.  (Hale Dep. 103:11-25).  Pennington "uncuffed [Hale] immediately at the stop sign of the jail and asked [Hale] if [she] was ready to go for a ride[,]" to which Hale responded in the affirmative.  (Hale Dep. 104:10-13).  Pennington then drove toward Pulaski County and eventually stopped at a gas station

to buy soft drinks for him and Hale, leaving Hale in the front seat uncuffed.  (Hale Dep. 104:13-14, 105:14-106:9, 113:7-13).  Pennington also let Hale smoke in the vehicle.  (Hale Dep. 106:8-9).  During the trip, Pennington and Hale held hands and Hale kissed Pennington's neck.  (Hale Dep. 106:16-21).  Pennington eventually drove to a field where he and Hale engaged in oral sex and intercourse.  (Hale Dep. 107:15-110:18).

Hale remained at the Boyle County Detention Center from February 2 to February 8.  (Defs.' Mot. Summ. J. Ex. 14, DN 55-15).  While there, Hale told a fellow inmate named Crystal Stevens ("Stevens") that she "had sex with the guy that was transporting me."  (Hale Dep. 116:15-117:5).  Another inmate overheard the conversation and later told Pennington what she had heard while Pennington was transporting that inmate at some point before February 8.  (Hale Dep. 116:15-118:11).

On February 8, Pennington again transported Hale from Boyle County to Marion County.  (Defs.' Mot. Summ. J. Ex. 14).  That trip "was a little different."  (Hale Dep. 116:8-13).  When Pennington put Hale in the transport vehicle, "he wasn't very friendly.  He didn't say anything."  (Hale Dep. 118:10-15).  Pennington did not immediately uncuff Hale when she got in the transport vehicle, unlike the other times he transported her, but he did put her in the front seat.  (Hale Dep. 118:15-18).  Pennington proceeded to take a "back way, not the normal way that you would go from Boyle County Detention Center to Marion."  (Hale Dep. 118:18-20).  Pennington "[drove] really fast and he was pissed off."  (Hale Dep. 118:23).  Pennington confronted Hale about telling someone about their sexual encounter.  (Hale Dep. 118:24-25).  Hale originally denied telling anyone but then admitted that she may have told Stevens within earshot of another inmate.  (Hale Dep. 119:8-25).  Pennington "was freaking out" and asked if Hale would be willing to take a pregnancy test and she agreed.  (Hale Dep. 120:1-3).  Pennington then pulled over to the side of a

road and uncuffed Hale, who proceeded to take the pregnancy test, which came back negative. (Hale Dep. 120:4-14).  Pennington and Hale then started kissing and had sex.  (Hale Dep. 120:15-19).  Afterwards, Hale "assured [Pennington] that [she] wouldn't tell anyone else and that if anybody asks, [she] would say it wasn't true."  (Hale Dep. 120:23-25).

Pennington transported Hale three more times—twice in March 2017, to and from the Boyle County Detention Center, and once in April 2017, from the Marion County Detention Center to the Boyle County Detention Center.  (Defs.' Mot. Summ. J. Ex. 15, DN 55-16; Ex. 16, DN 55-17).  On each of those trips, Pennington and Hale engaged in intercourse.  (Hale Dep. 123:5-9).

On April 5, 2017, a confidential informant at the Marion County Detention Center told a deputy sheriff that Hale was having sex with a transport officer and that Hale was planning an escape. (Defs.' Mot. Summ. J. Ex. 17, DN 55-18).  Dispatch relayed that information to Defendant Boyle County Sheriff Derek Robbins ("Robbins")  at 5:30 a.m. that day.  (Robbins Dep. 65:5-16, Sept. 20, 2018, DN 59-5).   Robbins determined that the deputy in question was Pennington. (Robbins Dep. 66:15-21).  Robbins then spoke with Boyle County's chief deputy and devised a plan to transport Hale back to Marion County and see if Hale brought up the allegations in passing. (Robbins Dep. 67:10-69:4).  Hale did not speak about the allegations on that drive, however. (Robbins Dep. 68:25).

Robbins investigated the allegations, eventually deciding to take disciplinary action. (Robbins Dep. 69:25-80:23).  On April 6, 2017, the day after Robbins first became aware of the allegations, he sent Pennington a "Notice of Interrogation" directing Pennington to appear on April 12, 2017, for an interview regarding Pennington's relationship with Hale.  (Defs.' Mot. Summ. J. Ex. 18, DN 55-19).  On April 7, Robbins suspended Pennington without pay.  (Defs.' Mot. Summ. J. Ex. 19, DN 55-20).  Robbins also contacted the Kentucky State Police to investigate the criminal

aspect of Pennington's reported relationship with a prisoner.  (Robbins Dep. 87:21-88:11).  Instead of participating in the investigation, Pennington resigned from the Boyle County Sheriff's Office on April 12, 2017.  (Defs.' Mot. Summ. J. Ex. 20, DN 55-21).

On November 16, 2017, Hale gave birth to a baby girl at Norton Women's and Children's Hospital.  (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. A, DN 59-1; Ex. B, DN 59-2).  DNA testing revealed that Pennington is the father.  (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. D, DN 59-4).

Hale brought this lawsuit on January 2, 2018, against multiple defendants, of which only Pennington, Robbins, and Boyle County, Kentucky ("Boyle County") remain.  (Compl. ¶¶ 3-7, DN 1; Am. Compl. ¶¶ 3-7, DN 39; Order, DN 65).  Hale asserts claims for violations of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, battery, intentional infliction of emotional distress, negligence per se, and negligence.  (Am. Compl. ¶¶ 23-70).

On July 22, 2019, Pennington filed a motion for summary judgment.  (Def.'s Mot. Summ. J. 3, DN 53).  On July 26, 2019, Robbins and Boyle County filed a joint motion for summary judgment.  (Defs.' Mot. Summ. J. 2, DN 55).  In response to both motions, Hale attached an affidavit as one of her exhibits, which is the subject of Defendants' motions to strike.  (Hale Aff., DN 59-7; Def.'s Mot. Strike Aff. ¶¶ 8, 12, DN 63; Defs.' Mot. Strike Aff. 1, DN 66).  After the pending motions were fully briefed, Hale filed a "Notice of Supplemental Authority in Support of Plaintiff's Responses to Defendant[s]' Motion[s] for Summary Judgment" on January 29, 2020, which is also the subject of Defendants' motions to strike and Hale's motion for leave to file such supplemental authority.  (Notice Suppl. Authority 1, DN 76; Notice Suppl. Authority Ex. A, DN 76-1; Def.'s Mot. Strike Suppl. Authority 2, DN 77; Defs.' Mot. Strike Suppl. Authority 1, DN 78; Pl.'s Mot. Leave File Suppl. Authority 1, DN 80).  These motions are ripe for decision.

## II.      JURISDICTION

Subject matter jurisdiction is afforded over this matter through federal question and supplemental jurisdiction.  *See* 28 U.S.C. §§ 1331, 1367(a).

## III.      STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the non-moving party must demonstrate that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment.  *Anderson*, 477 U.S. at 252.

## IV.      DISCUSSION

Generally, when both federal and state law claims are before a federal court, a federal court is to apply federal law to the plaintiff's federal law claims and state substantive law to the

7

plaintiff's state law claims. *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 737, 741 (6th Cir. 1999) (citations omitted). To the extent that state substantive law applies in this case, the law of the forum state, here Kentucky, applies. *Id*. (citation omitted).

### A.    Federal Law Claims

Hale's federal law claims all allege violations of her Fourteenth Amendment rights. Defendants' main argument as to why a genuine issue of material fact does not exist in this case is that Hale voluntarily engaged in, i.e., consented to, sexual relations with Pennington. (Def.'s Mem. Supp. Mot. Summ. J. 6-13; Defs.' Mem. Supp. Mot. Summ. J. 8-15).

### 1.    *Legal Standards Governing Counts I, II, and III*

#### a.    Counts I and II

In Counts I and II of Hale's Complaint, she asserts claims under the rubric of the U.S. Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 831 (1994). (Am Compl. ¶¶ 23-37). The Court in *Farmer* found that prison officials' "deliberately indifferent failure to protect [a convicted prisoner's] safety [is] a violation of [that convicted prisoner's] Eighth Amendment rights." *Id*. "[T]he constitutional right to be free from deliberate indifference to assault and sexual abuse [is] clearly established . . . ." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011). Even though Hale is a pretrial detainee, "[t]he analysis set forth in *Farmer*, although rooted in the Eighth Amendment, . . . applies with equal force to a pretrial detainee's Fourteenth Amendment claims." *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016) (citing *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 358 (6th Cir. 2016)); *see also Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) ("This Court has historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth amendment prisoner claims 'under the same rubric.'" (citation omitted)).

8

To maintain a *Farmer* claim, Hale must show a deprivation of her Fourteenth Amendment rights:  "[T]he deprivation alleged must be, objectively, 'sufficiently serious,'; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (internal citation omitted) (citation omitted).  Furthermore:

> To establish a claim for failure to protect, a plaintiff must show that prison officials acted with deliberate indifference to a substantial risk of serious harm.  Deliberate indifference has both an objective and a subjective component.  The objective component requires a prisoner to "show that he is incarcerated under conditions posing a substantial risk of serious harm," while the subjective component requires a prisoner to show that a defendant knew that the prisoner faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it."

*Dickerson v. Ky. Corr. Psychiatric Ctr.*, No. 17-5412, 2017 WL 8792665, at *2 (6th Cir. Oct. 12, 2017) (internal citations omitted) (citation omitted).

In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the U.S. Supreme Court held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet an objective component by showing that "the force purposely or knowingly used against him was objectively unreasonable." *Richmond*, 885 F.3d at 938 n.3 (quoting *Kingsley*, 135 S. Ct. at 2473).  Hale raises the exact issue that the Sixth Circuit in *Richmond* expressly declined to address:  "This Court has not yet considered whether *Kingsley* similarly abrogates the subjective intent requirement of a Fourteenth Amendment deliberate indifference [i.e., *Farmer*] claim." *Id*.  Although Hale pleaded Count I under the traditional elements of a *Farmer* claim, she invites the Court to rule on that issue by pleading Count II according to the elements of a *Farmer* claim as articulated by the Ninth Circuit in *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016), which modified its *Farmer* analysis in conformance with *Kingsley*. *Id*. (citations omitted); (Am. Compl. 7).

Regardless of whether *Kingsley* abrogates the subjective component of a *Farmer* claim, an inmate's consent would defeat both an objective and subjective component of such a claim.  In

9

other words, an inmate who voluntarily engages in sexual activity with a prison guard cannot be said to have been denied the minimal civilized measure of life's necessities—indeed what Fourteenth Amendment right has been denied to a pretrial detainee who engages in consensual sexual activity? *Farmer*, 511 U.S. at 834 (citations omitted); *cf. Carrigan v. Davis*, 70 F. Supp. 2d 448, 460 (D. Del. 1999) (recognizing that the Eighth Circuit in *Freitas v. Ault*, 109 F.3d 1335, (8th Cir. 1997), dismissed the plaintiff's Eighth Amendment *Farmer* claim for failure to satisfy the objective component since sexual interactions were consensual). Hale's purported consent, therefore, would bar her *Farmer* claims. This same analysis extends to Hale's *Castro* claims, as a *Castro* claim is simply a *Farmer* claim minus the subjective component. *Castro*, 833 F.3d at 1070-71 (citations omitted).

### b.      Excessive Force Standard

Hale asserts that the Court should also apply an excessive force standard to evaluate Counts I and II. (Pl.'s Resp. Def.'s Mot. Summ. J. 8, DN 59). Pennington does not challenge the sufficiency of Hale's Complaint in that regard. (Def.'s Reply Mot. Summ. J. 7-8, DN 75). "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. Importantly however, "to state an excessive force claim under the Fourteenth Amendment, a pretrial detainee must allege that an officer used force against him . . . ." *Major v. Cooper*, No. 19-299-JMH, 2019 WL 3430773, at *1 (E.D. Ky. July 30, 2019) (citing *Kingsley*, 135 S. Ct. at 2472). In other words, Pennington must have "actually used force against" Hale. If the sexual relations between Pennington and Hale were consensual it cannot be said that "force" was used against Hale, thus negating Hale's excessive force claim. *Id.*; *cf. Hall v. Beavin*, 202 F.3d 268, 1999 WL 1045694, at *1 (6th Cir. 1999) ( "[T]he

evidence establishes that [the prisoner] voluntarily engaged in a sexual relationship with [the prison guard].  Thus, [the prisoner's] Eight Amendment claim is without merit.").

### c.　　Count III

In Count III of the Complaint, Hale asserts a violation of her substantive due process "right to bodily integrity, an indispensable right recognized at common law as the 'right to be free from . . . unjustified intrusions on personal security' and 'encompass[ing] freedom from bodily restraint and punishment.'" *Guertin v. State*, 912 F.3d 907, 918 (6th Cir. 2019) (citations omitted). The Sixth Circuit "use[s] the 'shocks the conscience' rubric to evaluate intrusions into a person's right to bodily integrity." *Id*. (quoting *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996)).  Notably, "consensual sexual conduct, even if highly inappropriate, does not shock the conscience." *Hassan v. City of Shreveport*, No. 15-2820, 2018 WL 3028951, at *3 (W.D. La. June 18, 2018); *see also Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012) ("Under the substantive due process clause of the Fourteenth Amendment, individuals possess a constitutional right to be free from *forcible* physical intrusions of their bodies *against their will* . . . ."  (citations omitted) (emphasis added)).  So, to the extent that Hale voluntarily engaged in sexual activity with Pennington, her substantive due process claim would fail.

### d.　　Consent Defense

The parameters of legitimate consent by an inmate to sexual relations with a prison guard was addressed by the Sixth Circuit in *Rafferty v. Trumbull County*, 915 F.3d 1087 (6th Cir. 2019). In *Rafferty*, the plaintiff-inmate brought an Eighth Amendment excessive force claim against a defendant-corrections officer for "demand[ing] that [the inmate] expose her breasts for him to view on three or four occasions." *Rafferty*, 915 F.3d at 1091-92.  Additionally, the inmate alleged she masturbated for the officer at his request.  *Id*.  In challenging the plaintiff-inmate's Eighth

Amendment claim against him, the defendant-corrections officer argued that the inmate "consented to his sexual advances." *Id.* at 1096. The Court in *Rafferty* refused to find in favor of the corrections officer on the inmate's Eighth Amendment claim because of "a disputed issue of material fact about whether [the inmate] consented" but also because "as [the defendant-corrections officer] acknowledge[d], 'inmates are generally regarded as unable to consent to sexual relations with prison staff.'" *Id.* (citing *Wood v. Beauclair*, 692 F.3d 1041, 1047-49 (9th Cir. 2012)).

The Sixth Circuit's statement and its citation to *Wood* provide guidance as to the legal standard governing whether an inmate can legitimately consent to sexual relations with a prison guard to bar a plaintiff's Section 1983 claims based on constitutional violations against that prison guard. *Rafferty* noted from *Wood* that "when a prisoner alleges sexual abuse by a prison guard . . . the prisoner is entitled to a [rebuttable] presumption that the conduct was not consensual." *Rafferty*, 915 F.3d at 1096 (quoting *Wood*, 692 F.3d at 1049). In *Wood*, the Court articulated the showing a defendant must make to overcome the presumption:

> The state [] may rebut this presumption by showing that the conduct involved no coercive factors. We need not attempt to exhaustively describe every factor which could be fairly characterized as coercive. Of course, explicit assertions or manifestations of non-consent indicate coercion, but so too may favors, privileges, or any type of exchange for sex. Unless the state carries its burden, the prisoner is deemed to have established the fact of non-consent.

*Wood*, 692 F.3d at 1049. Thus, although a presumption of nonconsent exists on the part of an inmate to sexual relations with a prison guard, that presumption is rebuttable.

Contrary to Hale's protestation, *Rafferty* does not completely foreclose an inmate's ability to consent to a sexual relationship with a prison guard for the purpose of Section 1983 claims. Hale argues that Kentucky statutes criminalize prison guards' sexual relations with inmates and establish that an inmate is legally incapable of ever consenting to such a relationship with a prison

12

guard.  (Pl.'s Resp. Def.'s Mot. Summ. J. 12-14); *see* KRS 510.020(3)(f); KRS 510.060(1)(e); KRS 510.090(1)(e); KRS 510.120(1)(b).  As a sister court addressing this point concluded, "we are not swayed by Plaintiff's argument that just because for criminal prosecution purposes an inmate is considered incapable of providing consent, this necessarily equates to, in terms of civil rights vindication, a finding that the 'consensual' relationship between him and [the prison guard] *per se* violated the Federal Constitution." *McGregor v. Jarvis*, No. 9:08-CV-770-GLS-RFT, 2010 WL 3724133, at *10 (N.D.N.Y. Aug. 20, 2010); *see also Doe v. Cunningham*, No. 3:06-CV-00019, 2007 WL 990141, at *2 (E.D. Va. Mar. 29, 2007) ("This Court is persuaded that the Eighth Circuit was correct when it found that welcome, voluntary attentions are not violations of a prisoner's rights, even when they are prohibited by state law.").

More importantly, if the Court in *Rafferty* believed that a state's criminalization of a prison guard's sexual relations with an inmate established a per se violation of that inmate's constitutional rights, it would have stated so instead of adopting a rebuttable presumption standard.  Ohio law, the state substantive law in *Rafferty*, criminalizes prison guard sex with an inmate just like Kentucky.  *See* Ohio Rev. Code § 2907.03(A)(11).  If a state's criminalization of sexual relations between a prison guard and inmate established an automatic Section 1983 constitutional violation, then *Rafferty* would not have highlighted the rebuttable presumption established in *Wood*, nor examined the factual circumstances at hand to determine if consent existed.

For these reasons, the defendants' purported consent defense to Hale's *Farmer*, *Castro*, excessive force, and substantive due process claims must be analyzed under the rubric identified in *Rafferty*.

2.    *Merits of Defendants' Consent Defense*

Attempting to establish the requisite consent by Hale to engage in sexual acts with

Pennington and rebut *Rafferty*'s presumption of nonconsent, Defendants cite extensively to Hale's

deposition testimony:

Q    So what I just heard you say—and I'm summarizing this, and you tell me if I'm wrong or right, okay?
A    Okay.
Q    What I heard you say was, I'm in jail, it was a pretty day, I wanted to stay out a little bit longer—
A    Yes, ma'am.
Q    —and I asked him if I could?
A    Yes.
Q    And you suggested that he take the long way so you could see more daylight?
A    Yes.
Q    And he was nice and he did that?
A    Yes.
Q    Okay.  All right.  So he took the long way to Taylor County –
A    Yes.
Q    —so you could see more daylight.  And what kind of conversations did you have on the way to Taylor County?
A    Well, after this gas station, we were going – it's a two-lane highway, but it's kind of out of in the country.  He took his handcuff key out of his pocket and said, let me see your hands.  And I held them up and he uncuffed me and said, you're in control now.  I wasn't quite sure what that meant, but beings that he was a man and I was a girl, I kind of insinuated maybe he was insinuating something sexual.  There had been a running joke out at Marion County jail with an inmate for a few weeks.   And this is embarrassing.
Q    I'm going to assure you that everyone in this room has probably heard worse.
A    Well it's still embarrassing.  So I said – because I was unsure of what he meant by you're in control now – this is so embarrassing.  I looked at him and said, I'll suck your dick if you're cool with it.  I said, I'm just kidding kind of.  I said, a girl in my cell has been saying that, but it was kind of like a—I don't know, kind of feel him out, see what that comment meant.  And he didn't respond with any words.  He was smiling.  And I said, well, find a back road.  I don't think he knew the area well either, neither of us did.  So we pulled off on a couple of little roads and turned around a time or two.  We finally found a little field to pull into where—yeah.  So I think we were both kind of nervous.  And I really wasn't sure what was about to happen

14

and I don't think he was either.  We started kissing and eventually his pants were undone.

Q      Who undid his pants?

A      He did.  And I performed oral sex on him.

. . .

Q      So the first week in January, this is the second time that you've met [Pennington].

A      Yes.

Q      You offered to perform oral sex on him?

A      Yes.

Q      Did he ever deny you?  Did he ever say no?

A      No.

Q      So you offered to perform oral sex on [Pennington].  I am assuming that means you were a voluntary participant?

A      Yes.

Q      Did [Pennington] ever force you or use force during this trip back that first week in January?

A      No.

Q      You voluntarily performed oral sex on him?

A      Yes.

Q      So you said that you were kissing.  I'm assuming that means lips to lips?

A      Yes.

. . .

Q      When's the next time that you saw [Pennington]?

A      February.  Around about the first week of February.

Q      So about a month later?

A      Yes.

Q      And what circumstances did you see him then?

A      The same.  To be transported to Boyle County for—

Q      So he picked you up at Marion County to take you to Boyle County?

A      Yes, ma'am.

Q      Both of the jails?

A      Yes.

Q      Were you alone or did [Pennington] have anybody else with him during the trip there?

A      When he picked me up, it was just him and I.

Q      Okay.  At any point during the trip there, did you have someone else with you?

A      Yes.

Q      Tell me what type of conversations you had with [Pennington] during that trip there.

A      When we pulled out of the Marion County Detention Center, he uncuffed me immediately at the stop sign of the jail and asked me if I was ready to go for a ride.  I said yes.  And we proceeded to go towards Pulaski County, the back way kind of—well, I don't know.  It might be the only way from Lebanon.  I'm not familiar.  But we went through Columbia, I think.

Q     Did you object or tell—did you object to Mr. Pennington transporting you after the first week in January?

A     I did not.

Q     Did you tell anyone at the Marion County Detention Center or the Boyle County jail that you didn't want to be transported by [Pennington]?

A     I did not.

Q     You did want to be transported by [Pennington]; is that fair?

A     Yes.

Q     He let you have more freedom than others?

A     Yes.

Q     Thank you.  So when he came to pick you up the first week of February at the Marion County Detention Center, you didn't object to that, right?

A     Right.

Q     Did you have any more talks of a sexual nature or did any sex acts occur during this trip to Boyle County?

A     Yes, ma'am.

Q     Okay.  Tell me about that.

A     We stopped at a gas station off the bypass of Columbia, where he again left me in the car.  He went in to get something to drink, I think.

Q     Were you uncuffed and in the front seat when he went into the gas station?

A     Yes.

Q     He didn't handcuff you back?

A     No.

Q     Okay.

A     We, again, found – turned on a side road off the bypass and found a field that we pulled pretty far off.

Q     Let me stop you for a second.  Did he buy you anything when he went into the gas station?

A     Just a soft drink.

Q     Did you ask him for it?

A     Yes.

Q     Told him what you wanted?

A     Yes.

Q     Was he letting you smoke?

A     Yes.

Q     How did this pulling off into the field thing occur during the second trip?  Whose idea was it?

A     I think it was probably mutual.  I really honestly don't remember the conversation of, let's go.  But we were holding hands up until this point.  I probably had kissed on his neck and—yeah, up until—

Q     Okay.  So you left Marion County Detention Center.  Is it fair to say you were voluntarily holding hands with [Pennington]?

A     Yes.

Q     You were voluntarily kissing on his neck?

A     Yes.

Q      Any other types of physical affection or acts of a sexual nature that you voluntarily did before you got to the field?

A      That was – he was driving, so that was—yeah, that was it.

Q      Okay. All right. Once you—was it the same field?

A      No. It was—I had no clue where we were and I'm pretty sure he didn't either. This time was dark so—yeah.

Q      Was it dark because it was late at night or early in the morning?

A      No, it was late at night this time.

Q      Approximately what time?

A      He probably picked me up about 9:30-ish or so, I'm not exactly sure. But it was dark.

Q      Well, it's winter, so it was good and dark?

A      Yes.

Q      All right. About how long after the gas station stop for a drink did you-all pull off into the field?

A      As soon as we pulled out of there, we turned off on a side road. And, again, we didn't know that area, so it took us a place or two to – I think we pulled in a driveway and turned around, you know, the driveway of a barn or something and saw lights maybe or—I don't even know. But we tried another spot, and eventually we found another field that we pulled down in. He turned around, turned off the lights, and we then had sex in the front seat.

Q      Okay. And let me rewind just for a little bit. Because you said a lot. We weren't familiar with the area and we were looking for a spot. We pulled in here. Was it—is it fair for me to assume from that that it was a joint effort, you were both looking for a place to pull off so you could have some sort of sex?

A      Yes.

Q      You were no objecting to that? You engaged voluntarily in that act?

A      Yes.

. . .

Q      Okay. And you didn't complain or tell anybody at the Boyle County jail that you were having sex with [Pennington]?

A      I did not.

Q      Okay. And so I don't have to ask this every single time, let's just be clear. You never complained or told anybody about having sex with [Pennington] or told anybody about having sex with [Pennington] because you did that voluntarily, right?

A      I did. It was, I though, like kind of more than sex. It was—I mean, I did know he was married, but—

Q      You did not know he was married?

A      I did know he was married.

Q      Okay.

A      But he expressed concern for me and interest in me, yeah, so I was very comfortable with him and I trusted him. And I feel like he probably did me too.

17

Q      Okay.

A      So – yeah.

Q      So that's why you didn't complain to anybody.  It's like you had a boyfriend
       on the outside of the jail?

A      Yes.

Q      Okay.  He never forced you to do anything, and you enjoyed his company,
       and you enjoyed the sexual encounters you had?

A      Yes.

. . .

Q      Why did you tell or—when did you tell the two other—your two other
       cellmates . . . that you had had sex with . . . Pennington?

A      Probably the trip back, February.  When I got back in February.

Q      Okay.  So you told them before you found out you were pregnant?

A      Yes.

Q      And what was your motivation for telling them?

A      Like I said earlier, I felt like there were some kind of feelings there.  They
       were the closest people around me.  You know, that's who I was with 24
       hours a day for months.  And the—Crystal, you know, she knew, and the
       other lady already knew that I had told.  So I now felt like I could tell
       someone, I guess.

Q      Okay.  And here's where I'm going to draw an assumption again.

A      Okay.

Q      You said you felt like there was something there, so you wanted to tell
       somebody.  . . .  What I heard you say was, I was excited I had feelings for
       someone.  I felt like he had feelings for me.  I wanted to tell somebody about
       it.

A      Yes.

Q      Okay.  So that's why you told the folks you were in a cell with?

A      Yes.

. . .

Q      I believe you testified earlier that you never complained to anyone about the
       fact that you had had sex with Mr. Pennington; is that right?

A      Yes.

. . .

Q      Did you ever file a grievance either with the Marion County Detention
       Center or the Boyle County Detention Center about your relationship with
       Mr. Pennington?

A      I did not.

(Def.'s Mem. Supp. Mot. Summ. J. 7-13; Hale Dep. 95:11-97:14, 98:6-24, 103:11-108:11, 114:19-

115:24, 138:4-139:8, 141:22-25, 144:21-25).  Hale does not refute the fact that she voluntarily

consented to a sexual relationship with Pennington.[1]  Instead, Hale points to the existence of "the power dynamics between a law enforcement officer and an inmate [and] the coercive power of the privileges and favors he provided her during the transports . . . ."  (Pl.'s Resp. Def.'s Mot. Summ. J. 1).

The effect of the dynamics between a law enforcement officer and an inmate on that inmate's ability to consent to a sexual relationship with the law enforcement officer has already been addressed through *Rafferty*'s establishment of a rebuttable presumption of nonconsent. Indeed, that is the very reason that a rebuttable presumption of nonconsent exists.  *See Rafferty*, 915 F.3d at 1096 (citing *Wood*, 692 F.3d at 1047-49).  As for the coercive power of the privileges and favors Pennington provided Hale, she specifically points to the following:  Pennington's questions about Hale's legal troubles; Pennington taking Hale on extended trips so she could enjoy time outside of jail; transporting Hale in the front seat unrestrained by handcuffs; buying Hale soft drinks; letting Hale smoke during the trips; and Pennington giving Hale his cell phone number and speaking to her a number of times while she was imprisoned.  (Pl.'s Resp. Def.'s Mot. Summ. J. 4, 15; Hale Dep. 92:20-93:7, 94:1-11, 95:1-10, 96:7-11, 104:10-13, 105:14-106:9, 123:17-124:4).

Hale also points to other factual allegations that are the subject of Defendants' motions to strike and Hale's motion for leave to file a notice of supplemental authority which document Pennington's state court guilty plea to sexual misconduct and bribery of a public servant.  (Hale

---

[1] A court interpreting *Wood* expounded on Defendants' burden: "[T]he issue of whether Defendant violated Plaintiff's constitutional rights cannot be determined from isolated statements taken from Plaintiff's deposition.  Rather, a determination of whether Plaintiff and Defendant's relationship was consensual must be based on the totality of the circumstances."  *Cordoba v. Pulido*, No. C-12-04857-SBA, 2017 WL 11500709, at *4 (N.D. Cal. Aug. 16, 2017) (citing *Chao v. Ballista*, 772 F. Supp. 2d 337, 348-49 (D. Mass. 2011)).  Unlike in *Cordoba*, however, Hale's quoted testimony does not constitute "isolated statements from [her]'s deposition" but rather an extensive and detailed description by Hale of her interactions with Pennington.

Aff. ¶¶ 1-7; Notice Suppl. Authority 1-3; Notice Suppl. Authority Ex. A).   Hale argues that Pennington's guilty plea to these two charges precludes him from arguing that Hale consented to sexual activity with him and was not coerced into doing so.   While it is true that Pennington's guilty plea estops him from denying facts supporting his guilty plea, Pennington is only estopped now from denying what he, in fact, admitted to.   *See Mason v. Louisville Police Dep't*, 8 F. App'x 326, 327-28 (6th Cir. 2001) (party "estopped by his guilty plea from now alleging" claims that "would imply the invalidity of his convictions." (citations omitted)).

Pennington pleaded guilty to "Sexual Misconduct" which is defined as "engag[ing] in sexual intercourse or deviate sexual intercourse with another person without the latter's consent." (Notice Suppl. Authority Ex. A, at 3, DN 76-1); KRS 510.140(1).   Based on the facts underlying Hale's claims, it becomes clear that her purported lack of consent is premised upon the fact that she was "[u]nder the care or custody of a state of local agency pursuant to court order" at the same time that Pennington was "employed by or working on behalf of the state of local agency."   KRS 510.020(3)(f).   This is evident from Hale's admission that she "is not arguing and never argued that Pennington *forcibly* compelled her to engage in sexual contact.   Hale's argument is that Pennington used privileges, favors, and exchanges to coerce Hale."   (Pl.'s Resp. Defs.' Mot. Strike Aff. 2, DN 70).   Pennington's guilty plea to sexual misconduct is rooted in Kentucky's criminalization of sexual relations between a prison guard and inmate.   Hale's use of Pennington's guilty plea here is a continuation of her argument that Kentucky's criminalization of sexual relations between an inmate and a guard automatically results in Section 1983 Fourteenth Amendment violation liability.   As previously explained, however, that is simply not the case. *McGregor*, 2010 WL 3724133, at *10; *Doe*, 2007 WL 990141, at *2.

Pennington's guilty plea to bribery of a public servant is similarly inconsequential. "A person is guilty of bribery of a public servant when . . . [w]hile a public servant, he solicits, accepts, or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion, or other action as a public servant will thereby be influenced." KRS 521.020(1)(b). There is no indication that "coercion" is a necessary element of the offense proscribed by KRS 521.020(1)(b). *See Coercion*, Black's Law Dictionary (11th ed. 2019) ("Compulsion of a free agent by physical, moral, or economic force or threat of physical force."); *see also Warren v. Erdos*, No. 1:17CV813, 2018 WL 10195818, at *12 (N.D. Ohio Apr. 5, 2018) ("Webster's Third New International Dictionary defines coercion as 'the act of coercing: use of physical or moral force to compel to act or assent,' and to coerce as 'to restrain, control or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation).'" (citation omitted)). In other words, Pennington's acknowledgement that he solicited, accepted, or agreed to sexual favors from Hale in exchange for certain privileges and favors does not necessarily indicate that he compelled Hale to do something that she otherwise would not have done. Determining if Hale was truly coerced into engaging in sexual activity with Pennington turns upon the particular facts of this case.

As instructed by *Wood*, the case relied upon by the Sixth Circuit in *Rafferty*, Defendants can "rebut th[e] presumption [of nonconsent] by showing that the conduct involved *no* coercive factors." *Wood*, 692 F.3d at 1049 (emphasis added). Importantly, the Court identified factors that may indicate coercion such as "favors, privileges, or any type of exchange for sex"; the Court's use of the word "may" indicates that the simple exchange of favors, privileges, or any type of exchange for sex does not automatically indicate coercion. *Id*. (emphasis added); *see also Graham v. Sheriff of Logan Cty.*, 741 F.3d 1118, 1120-26 (10th Cir. 2013) (finding the *Wood* presumption

to be rebutted despite prison guard allowing inmate to use intercom and providing inmate with a candy bar and blanket).

Cases applying *Wood* in denying summary judgment to the defendant-prison guard reflect evidence of some direct or indirect objective manifestation of nonconsent or a subjective feeling of compulsion on the part of the inmate. *See, e.g.*, *Rafferty*, 915 F.3d at 1091-92 ("[The inmate] was deeply disturbed by [the prison guard's] demands. . . . [The inmate] never reported [the prison guard] to anyone in the Trumbull County Jail administration because she felt intimidated by him; she 'didn't know what to expect' if she refused his demands."); *Wood*, 692 F.3d at 1049 (" [The inmate] alleges that he and [the prison guard] were in a consensual relationship that involved hugging and kissing.  Just before the alleged incident, [the inmate] and [prison guard] got into a fight and he told her to 'back off' and that they had to 'stop' seeing each other for a while.  [The inmate]'s objective conduct demonstrates non-consent and the state cannot overcome its burden. [The inmate] has thus established non-consent for the purposes of surviving summary judgment."); *Cordoba*, 2017 WL 11500709, at *2 ("[The inmate] did, however, tell [the prison employee] to 'stop' because there were people in the office across the hall and someone might walk in on or see them. . . . When [the inmate] resisted [the prison employee's] demands for sex, [the prison employee] chided him as being 'gay.'  [The inmate] felt trapped working for [the prison employee] because he could not obtain another prison job without her approval.").

The present case bears no trace of resistance by Hale or any sense of compulsion to engage in sex with Pennington.  Hale's own testimony quoted extensively above refutes the existence of any coercive element that nullified her individual will.  Hale's own affidavit does so, as well:

"After the first encounter,[2] I had sexual contact with Pennington because he convinced me I could trust him, that he cared for me, and that he would help with my criminal case.  I *now* realize he did those things so that I would have sexual contact with him."  (Hale Aff. ¶ 6 (emphasis added)). Hale's statement here is essentially an admission that she did not feel coerced into sexual relations with Pennington at the time.  In fact, even Hale's affidavit establishes that she only "realized" in responding to Pennington's motion for summary judgment in April 2019 that she was a victim of Pennington's coercion.  Moreover, to the extent Hale attempts to contradict her deposition testimony through her affidavit, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."  *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)).

Hale additionally states that the first time she engaged in sexual activity with Pennington, she did so because she "believed that he was suggesting that [she] engage in sexual activity with him because he let [her] go with him to Taylor County and ride up front without handcuffs."  (Hale Aff. ¶ 3).  Although any type of exchange for sex "*may*" constitute a coercive factor precluding an inmate's consent to sexual relations with a prison guard, without some sort of direct or indirect objective manifestation of nonconsent or subjective perception of coercion by Hale, her simple belief that Pennington was suggesting sexual activity in exchange for the favors he provided her cannot establish those privileges nullified her will to act otherwise.  Again, Hale's affidavit, created and filed after Defendants' summary judgment motions, cannot be read to contradict her deposition

---

[2] It appears that Hale's articulation of her and Pennington's "first encounter" points to the first time they met, not the first time that they engaged in a sexual act, which occurred during their second encounter.

testimony, which articulated an emotional attraction as Hale's motivation for engaging in sex with Pennington. *See Reid*, 790 F.2d at 460 (citing *Biechele*, 747 F.2d at 215).

Hale does identify a number of privileges Pennington offered her that he presumably did not offer to other inmates.  (Pl.'s Resp. Def.'s Mot. Summ. J. 4, 15; Hale Dep. 92:20-93:7, 94:1-11, 95:1-10, 96:7-11, 104:10-13, 105:14-106:9, 123:17-124:4).  Yet, Hale's own view of her relationship with Pennington associated those favors as being offered in the context of a consensual relationship.  Without some objective manifestation or subjective feeling of involuntariness on the part of Hale (facts present in *Wood*, *Rafferty*, and *Cordoba*), special treatment by itself cannot be viewed as a coercive exchange for sex.  Similarly, even assuming that privileges could indicate coercion, Hale's testimony describing a voluntary and consensual relationship rebut the existence of and negate any coercive aspect of her sexual relations with Pennington.

The circumstances here are similar to those in *Graham v. Sheriff of Logan County*, where the Tenth Circuit upheld summary judgment in favor of the defendant-prison guards on an inmate's Eighth Amendment claims after finding the sexual relations between the inmate and defendant prison-guards to be consensual. *Graham*, 741 F.3d at 1120, 1126.  In its analysis, the Tenth Circuit explicitly declined to adopt the presumption standard set out by *Wood*.  *Id*. at 1126.  Importantly however, the Tenth Circuit stated that on the facts that case, "[e]ven were we to adopt the same presumption as the Ninth Circuit, the presumption against consent would be overcome by the overwhelming evidence of consent." *Id*.  The case at hand is analogous to the situation in *Graham*:

> Ms. Graham was an inmate at the Logan County Jail, where defendants Rahmel Jefferies and Alexander Mendez were guards.  Sometime between July 2009 and October 2009, Jefferies started speaking to Ms. Graham over the jail intercom system, which allowed guards in the control tower to speak to prisoners in their cells.  Contact could be initiated by either the guard or the prisoner, but the guard could turn off the system.  Ms. Graham and Jefferies began to talk about their likes, dislikes, interests, and families.

24

Over time they began to talk about having sexual intercourse, and Ms. Graham told Jefferies that she would like a man to make love to her.  The two also exchanged sexually explicit notes.  . . .

[Graham] testified at Mendez's trial that she enjoyed the conversations and note-writing and saw their exchanges as a "fling" and "something to do."  On one occasion she flashed her breasts at Jefferies, although he did not ask her to do so.  She said that she did this "[f]or the hell of it."

On two occasions Jefferies had complied with requests from Ms. Graham—for a candy bar and a blanket.  But she did not think that she had received any special treatment from him.

On October 7, 2009, a few weeks after Ms. Graham and Jefferies had begun conversing over the intercom, she was placed in solitary confinement for an unrelated disciplinary infraction.  The next evening Mendez called her over the intercom in her cell and asked if she was asleep.  Before that night the two had only had brief and appropriate contact.  On this occasion, however, Mendez asked about her sexual fantasies and began to tell her about his own.  She responded that her fantasy was to "be with two men at the same time."  He asked who she would like him to bring.  She said, "Bring Jefferies."  He then asked if he could come down to her cell and look at her naked through the window, and she agreed.  She testified that his request made her feel wanted and appreciated.  When Mendez got to the cell, Ms. Graham, who was naked, stood up and let him look at her.  Because the cell was completely dark, Mendez shined his flashlight through the cell-door window to see her.  The encounter lasted 30 seconds or less.

In the early morning of October 9, 2009, either Jefferies or Mendez called Chris Haywood, a guard stationed in the control tower, to ask that Ms. Graham's cell be opened.  When she heard her cell door slide open, she got up and found Mendez standing in the doorway with Jefferies behind him.  She was wearing just her T-shirt.  Mendez took it off and Ms. Graham kissed Jefferies.  She testified that it was then "back and forth" between the two men, and both had their hands on her.

Jefferies began to have intercourse with Ms. Graham while she simultaneously performed oral sex on Mendez.  The two men then switched positions, although Mendez was able to penetrate her only briefly.  Mendez then dropped his radio.  She stood up at least partially, but Mendez, still trying to have sex with her, pushed her head back down toward Jefferies, saying, "Bend over, bitch," and "Shhh."  When, however, she heard another female inmate move and a coughing noise, Jefferies and Mendez fastened their pants and left the cell.

[During the investigation of the sexual encounter, Graham] said that the sex was consensual. . . .  When [investigators] asked her if the sex was consensual; she responded, "With Jefferies.  I didn't really want Mendez there."  When asked if she was forced or given any promises, she said no.  She said that the reason she came

forward was to "get if off [her] chest" because she felt guilty.  She later testified in her deposition in this case that she thought that what happened was wrong and that she felt she was "[s]upposed to be protected," but that she would not have had the same concerns about the sexual acts if she had been free.  She also stated that she felt her "rights" were taken from her when she was incarcerated and that she had no "control over it."

*Id*. at 1120-22.

Hale's involvement with Pennington is comparable to Graham's relations with Jefferies and Mendez.  Just like with Graham and the guards, Hale and Pennington first interacted through conversation.  *Graham*, 741 F.3d at 1120-21; (Hale Dep. 92:5-95:10).  Jefferies allowed Graham to converse with him through the use of an intercom system that he controlled and complied with Graham's requests for a candy bar and a blanket; Pennington allowed Hale to sit in the front of his transport vehicle uncuffed and let her smoke and drink soft drinks.  *Graham*, 741 F.3d at 1120-21; (Hale Dep. 92:20-93:7, 104:10-14, 105:14-106:9).  Specifically with Jefferies, Graham invited sexual activity by telling Mendez to bring Jefferies if they were to engage in sexual activity; Hale similarly initiated sexual contact with Pennington by offering to perform oral sex on him.  *Graham*, 741 F.3d at 1121; (Hale Dep. 96:23-25).  Like Graham, Hale has consistently characterized her sexual relationship with Pennington as voluntary and mutual.  *Graham*, 741 F.3d at 1122; (Hale Dep. 98:13-21, 106:10-107:1, 108:2-12, 114:23-115:23, 138:14-139:8).  Even with the privileges Jefferies afforded to Graham, the Tenth Circuit concluded any rebuttable presumption of coercion was "overcome by the overwhelming evidence of consent." *Graham*, 741 F.3d at 1126.

Hale's interactions with Pennington are arguably even more consensual than Graham's interactions with Mendez.  Pennington's indications that Hale could engage in sexual activity with him by moving Hale to the front of the vehicle, uncuffing her, and telling her that she was in control, are comparable to Mendez's dealings with Graham.  (Hale Dep. 92:22-93:7, 96:11).  Graham "testified that [Mendez's] request made her feel wanted and appreciated", similar to

26

Hale's description of her relationship with Pennington as one of boyfriend-girlfriend.  *Graham*, 741 F.3d at 1121; (Hale Dep. 114:23-115:21).  Although Graham expressed some reluctance in that she "didn't really want Mendez there" during the sexual encounter, Hale has not even hinted at having done anything with Pennington against her will.  *See Rafferty*, 915 F.3d at 1096.  Hale did not manifest resistance to sexual activity with Pennington nor did she describe any kind of contemporaneous mental reservation whatsoever.  To the contrary, Hale readily admitted that she was the one who initiated the first sexual encounter with Pennington.  Under these facts, Hale's inability to provide any evidence suggesting a subjective feeling of compulsion in engaging in sexual acts with Pennington defeats her *Farmer*, *Castro*, excessive force, and substantive due process claims.  *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 194 (5th Cir. 2011) (dismissing claim with prejudice on motion for summary judgment after recognizing that "[s]ummary judgment . . . is the procedural equivalent of a trial and is an adjudication of the claim on the merits." (citation omitted)).  Defendants have rebutted the *Wood* presumption of nonconsent, despite the existence of favors, because Hale's testimony refutes the existence of any coercion associated with those acts and negates the existence of any genuine issue of material fact regarding her having voluntarily engaged sexual activity with Pennington.  Pennington's motion for summary judgment regarding Hale's claims for excessive force and for violation of her substantive due process rights will be granted.

As a final matter, Hale's motion for leave will be granted and Defendants' motions to strike will be denied.  As demonstrated, even when considering Hale's Affidavit and her Notice of Supplemental Authority, no genuine issue of material fact exists to preclude the grant of summary judgment in Defendants' favor.  As such, there is no reason to strike Hale's Affidavit from the

record[3] or to preclude Hale's Supplemental Authority from being part of the record. *See generally Agent v. Buffalo Valley, Inc.*, No. 1:13-0133, 2015 WL 1756891, at *1 (M.D. Tenn. Apr. 17, 2015) ("[M]otions to strike . . . are disfavored and typically only apply to pleadings, not evidentiary offerings such as affidavits." (citations omitted)).

### 3. *Remaining Federal Law Claims*

Count IV is a Section 1983 Fourteenth Amendment claim premised off of the theory of supervisory liability and is asserted only against Robbins. (Am. Compl. ¶¶ 44-48). Count V asserts Section 1983 Fourteenth Amendment claims premised off of a failure to adequately train, supervise, or discipline Pennington against Boyle County and Robbins. (Am. Compl. ¶¶ 49-54). Importantly, both claims require Hale to demonstrate first that Pennington violated her constitutional rights. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("Plaintiff argues that the City of Battle Creek and the Calhoun County Sheriff failed to properly train the individual

---

[3] In her affidavit, Hale asserts that she "felt intimidated from answering [deposition] questions freely" because at her deposition, "Pennington sat next to his attorney, who was directly across from [her] asking [her] questions. [Pennington] stared at [her] when [the attorney] asked [her] questions about sexual contact with [Pennington]." (Hale Aff. ¶ 7). Hale's assertions in this regard are without merit. Hale waited until almost a year after her deposition to make these claims. (Hale Aff. 3). As noted by Defendants, "[neither] Plaintiff, nor her counsel, at any time before, during, or after Plaintiff's deposition indicated that Plaintiff would be unable to tell the truth at her deposition, or would be otherwise uncomfortable in her deposition, if Pennington attended same . . . ." (Def.'s Mot. Strike Aff. ¶ 11); *see also* (Def.'s Reply Def.'s Mot. Strike Aff. 10, DN 71) ("Plaintiff was made expressly aware of Pennington's presence and encouraged to take a break from the deposition at any time, for any reason. Plaintiff's lawyer was sitting next to Plaintiff and voiced no objection, on the record or off, to Pennington's presence at the deposition"). Hale's suggestion that her testimony should be viewed with skepticism is rejected considering all the opportunities she had to address those concerns before raising them only in response to Defendants' motions for summary judgment.

defendants . . . .  If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citation omitted)).  Because Hale has not demonstrated that Pennington violated her constitutional rights, these claims will be dismissed with prejudice, as well.

### B.   State Law Claims

Finally, Hale has asserted a number of state law claims against Defendants.  Courts are strongly encouraged to consider the issue of the dismissal of any remaining state law claims after all federal claims have been dismissed and diversity jurisdiction is not present.[4]  *See Arrington v. City of Raleigh*, 369 F. App'x 420, 421 (4th Cir. 2010) (per curiam) ("[T]he district court should have remanded the case to state court upon the dismissal of all federal claims, even in the absence of a motion from the parties that it do so.").  "A district court's decision whether to exercise [] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citations omitted).  The Sixth Circuit in *Gamel v. City of Cincinnati*, 625 F.3d 949 (6th Cir. 2010), explained the analysis this Court must conduct:

> "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."
>
> There are, however, circumstances where a district court should retain supplemental jurisdiction even if all of the underlying federal claims have been dismissed. In *Harper v. AutoAlliance Intern., Inc.*, 392 F.3d 195 (6th Cir. 2004), for example, the court found that the following factors weighed in favor of retaining supplemental jurisdiction over the remaining state-law claims:  (1) the plaintiff had engaged in forum manipulation by deciding to dismiss his federal-law claims only after the case had been on the district court's docket for 11 months, (2) the parties

---

[4] Diversity jurisdiction is not present here because all parties are Kentucky citizens.  (Am. Compl. ¶¶ 2-7); *see V & M Star, LP v. Centimark Corp.*, 596 F.3d 354, 355 (6th Cir. 2010) ("Under [] [28 U.S.C. § 1332,] there must be complete diversity such that no plaintiff is a citizen of the same state as any defendant."  (citing *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005))).

29

had completed discovery, and (3) the defendants' summary-judgment motions were ripe for decision. Moreover, the district court "was familiar with the facts of the case and already had invested significant time in the litigation." This court therefore concluded that the district court had properly exercised supplemental jurisdiction over the remaining state-law claims.

*Id*. at 952 (internal citations omitted) (citation omitted). The Court in *Gamel* also pointed to evaluation of the *Carnegie-Mellon* factors in determining whether the district court should retain supplemental jurisdiction over the claims: "the values of judicial economy, convenience, fairness, and comity." *Id*. at 951-52 (internal quotation marks omitted) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

*Gamel* and *Carnegie-Mellon* suggest a rebuttable presumption of dismissing remaining state law claims when all original jurisdiction claims have been dismissed. Also weighing toward dismissal is the fact that no evidence of "forum manipulation" exists here, unlike in *Harper*. On the other hand, weighing in favor of retention here is the fact that this case has been on the Court's docket for more than two years, discovery is over, and this case is at the summary judgment stage. That being said, in evaluating the *Carnegie-Mellon* factors, comity weighs most heavily here. Addressing Hale's Kentucky state law claims would require the Court to address: (1) whether an inmate's consent to sexual activity with a prison guard precludes the inmate from bringing intentional tort and negligence claims under Kentucky law; and (2) how to evaluate whether an inmate has legitimately consented to sexual activity with a prison guard under Kentucky law. The parties have cited to and the Court's own research reveals no Kentucky source that directly addresses these matters. "[C]omity of courts, whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere," dictates that Kentucky courts should address these issues. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817 (1993) (Scalia, J., dissenting). The fairness factor also dictates that both parties should be afforded the opportunity to address

30

these apparent issues in a court better suited to address issues of first impression under Kentucky law. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

Although judicial economy and convenience weigh toward retaining jurisdiction over this case, fairness and comity weigh more heavily toward dismissal of Hale's state law claims. This consideration, coupled with the arguable presumption of dismissal in this situation and the absence of forum manipulation indicate that dismissal without prejudice of Hale's state law claims is the best course of action. As such, Hale's state law claims against Defendants will be dismissed without prejudice to afford Hale the opportunity to assert them in Kentucky state court. *See Wester v. Goodman*, No. 20-5178, 2020 WL 3989633, at *8 (6th Cir. July 15, 2020) ("The claim presents a novel issue of state law that, to the knowledge of both the parties and ourselves, has never been squarely addressed by the Tennessee courts. Where both parties have made plausible arguments in favor of their respective positions, this issue is therefore better left for the state courts to decide, especially given that all of the federal claims have already been dismissed").

## V.    CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motions for Summary Judgment (DNs 53, 55) are **GRANTED**. Plaintiff's federal law claims against Defendants are **DISMISSED WITH PREJUDICE**. Plaintiff's state law claims against Defendants are **DISMISSED WITHOUT PREJUDICE**.

2.    Plaintiffs' Motion For Leave to File a Notice of Supplemental Authority (DN 80) is **GRANTED**.

3.      Defendants' Motions to Strike (DNs 63, 66, 77, 78) are **DENIED**.

4.      The Clerk is directed to strike this matter from the active docket.

Greg N. Stivers, Chief Judge

United States District Court

September 22, 2020

cc:    counsel of record